UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re: | * | |
| ROY C. ESTES, JR., | * | Case No. 6:04-bk-12265-ABB |
| | * | Chapter 7 |
| Debtor. | * | |
| | * | |
| KENNETH HERRON, TRUSTEE, | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | Adv. Pro. No 6:04-ap-00274-ABB |
| JAMIE WHITEHEART, A/K/A JAMIE LYNCH, | * | |
| Defendant. | * | |

**FILED**
OCT 18 2005
CLERK, U.S. BANKRUPTCY
ORLANDO DIVISION

## MEMORANDUM OPINION

This case came before the Court on the Complaint to Set Aside Fraudulent Transfers Pursuant to 11 U.S.C. §§544 and 550[1] filed by Plaintiff Kenneth D. Herron, Jr., the Chapter 7 Trustee and Plaintiff ("Plaintiff" or "Trustee"), against Jamie Whiteheart, a/k/a Jamie Lynch, the Defendant ("Defendant"). This is an action to set aside and recover the value of certain transfers of real property and a mortgage made by the Debtor, Roy C. Estes, Jr. ("Debtor"), to the Defendant. A trial was held on August 10, 2005. After reviewing the pleadings and evidence, and hearing live testimony and argument of the parties, the Court finds that the Plaintiff has established the transfers are fraudulent and avoidable pursuant to applicable Florida state law and 11 U.S.C. §§544 and 550, and judgment will be entered for the Plaintiff.

The following Findings of Fact and Conclusions of Law are made:

## FINDINGS OF FACT

The Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on November 12, 2004 ("Petition Date").[1] The Debtor's Schedules set forth total assets valued at $13,095.00 and total unsecured claims in excess of $3,000,000.00.

The Debtor transferred substantially all of his assets to the Defendant approximately fourteen months before the Petition Date through a series of transactions. The transferred assets include: (1) two parcels of real property located in Citrus County, Florida ("Citrus Lots"); (2) a mortgage and promissory note secured by real property located in Citrus County, Florida ("Citrus Mortgage"); (3) thirty-six acres of real property located in Putnam County, Tennessee ("Tennessee Property"); and (4) a parcel of real property located in Sumter County, Florida ("Sumter Lot") (collectively, the "Transfers"). The transfers of the real property were accomplished by the Debtor through quitclaim deeds.

The Defendant sold the Citrus Lots and refinanced the Citrus Mortgage shortly after receiving these assets. She continues to own the Tennessee Property, the Sumter Lot, and the Citrus Mortgage. The total value received by the Defendant as a result of the Transfers was $211,054.79.[2] The Defendant provided no consideration for the Transfers.[3]

The Debtor was heavily in debt when he made the Transfers. He had been sued by several creditors and three state court lawsuits were actively pending against him involving

---

[1] Doc. No. 1.
[2] The Citrus Lots were valued at $54,000, as shown the by the sale proceeds received by the Defendant when she sold the two lots. The Citrus Mortgage was valued at $133,804.79. This value comprises the principal amount of the mortgage when the Defendant refinanced it after receiving it, plus $20,000.00 received by the Defendant as part of the refinancing. The Tennessee Property is valued at $18,000.00, and the Sumter County lot is valued at $5,250.00.
[3] The Defendant and the Debtor testified that the Defendant gave consideration for the Transfers by allegedly paying back a $90,000 loan--a loan which the Debtor purportedly made to the Defendant in August 2001. Their testimony is not credible. Neither the Defendant nor the Debtor ever produced any evidence of such payment. When deposed by the Trustee's counsel as to what he had done with the alleged loan proceeds, the Debtor responded, "none of your damn business, boy."

2

unsecured claims totaling more than $3,000,000.00. The Debtor's liabilities greatly exceeded his assets at the time of the Transfers and the Debtor became further insolvent as a result of the Transfers.

The Defendant is an experienced mortgage broker who lives in and conducts her mortgage business from an RV. She and the Debtor were romantically and financially involved at the time of the Transfers. The Debtor and the Defendant were involved in many financial transactions that were not at arms length, including the Transfers. The romantic relationship existed before the Transfers occurred and continued through the Petition Date. The Debtor and the Defendant were living together in the Defendant's RV at the Bryn Mawr Campground near St. Augustine, Florida on the Petition Date and for at least one month thereafter. The Debtor has no permanent physical address and has used multiple addresses on publicly recorded documents

The Debtor paid many of the Defendant's expenses including the campground rental charges, insurance for the RV, a campground membership, cellular telephone bills, homeowner's dues on real property owned by the Defendant in Arkansas, and a credit card balance in the amount of $4,295.00. The Defendant has allowed the Debtor use of a mobile telephone on her Verizon account since April 2004 to the present.

The Debtor often used the Defendant's last name as an alias. The Debtor and the Defendant were involved in selling artwork over the Internet and he used the name "Raul Whiteheart" in their business ventures. The Debtor identified himself as "Raul Whiteheart" in a website he created for the Defendant's company Forever Sunrizes. The Debtor stated in his company's website that he, Raul Whiteheart, and "his wife Jamie Whiteheart" were living together full time in the Defendant's RV and gave the Defendant's mailing address as the

mailing address for his company. The Debtor also used the Defendant's home address as his address in official documents, including two deeds that were recorded in the public records. The Defendant signed one deed as the grantee and the second as a witness. The Defendant was well aware of the Debtor's use of her address as his own.

The Debtor continued to exercise management and control of the assets after he made the Transfers. He: (i) negotiated a refinancing of the Citrus Mortgage with the mortgagor and prepared a mortgage modification agreement pursuant to which the Defendant received $20,000.00 in cash; (ii) paid real property taxes for several tax years on the Sumter Lot and the Tennessee Property; (iii) generally assisted with management of the transferred properties; and (iv) advertised the Tennessee Property for sale using, with the Defendant's permission, the website for Forever Sunrizes.

The close financial dealings between the Debtor and the Defendant included a transaction on April 8, 2003 in which the Debtor transferred $90,000.00 from his personal bank account with SunTrust Bank to a company owned by the Defendant. The Defendant paid no consideration for the transfer.[4] The Defendant explained she took the funds to hold and "clear" them for the Debtor until he requested she return them. She further testified that the money "was not hers." The Debtor stated he "parked" the funds with the Defendant's company. The funds were repaid to the Debtor at some point, with some of the repayment funds going to Setse, Inc., a company formed by the debtor.[5] The Trustee asked the Debtor during a deposition why he formed Setse,

---

[4] These funds represented the proceeds from the sale of real property in Georgia on which the debtor held a mortgage. The debtor received these funds at a time when he was being sued by creditors in the state court lawsuits discussed above.

[5] "Setse" is "Estes" spelled backwards.

4

Inc., and he responded, "because you're suing me." The Debtor failed to disclose the existence of Setse, Inc. in his original Schedules and Statement of Financial Affairs.[6]

The Defendant and the Debtor attempted to conceal their personal and financial relationship from the Trustee and the Debtor's creditors. They obstructed the Trustee's efforts to investigate their relationship and dealings. The Defendant gave false testimony at her Federal Rule of Bankruptcy Procedure 2004 examination by failing to disclose the many dealings between her and the Debtor and the nature of their relationship. The Defendant testified that she did not have a current phone number for the Debtor, but the Debtor's cell phone was on her Verizon account. The Defendant testified she held a security interest in the transferred properties, but did not produce evidence of her alleged interest. The Defendant failed to produce documents requested by the Trustee pursuant to Federal Rule of Bankruptcy Procedure 2004. The Debtor testified at his §341 meeting of creditors he knew the Defendant as "Jamie Lynch" and he had not spoken to her in three or four months. However, he was living with the Defendant in her RV at the time. The Debtor did not disclose in his bankruptcy papers he was living in the RV at the campground on the Petition Date.

The Debtor, while insolvent and with litigation pending, transferred substantially all of his assets, including the Citrus Lots, the Citrus Mortgage, the Tennessee Property, and the Sumter Lot to the Defendant. The Defendant is an insider and the initial transferee. The transferred assets could have been applied to payment of the Debtor's creditors' claims. He

---

[6] The Court does not address in this opinion whether the $90,000.00 transfer to Whiteheart is subject to avoidance as a fraudulent transfer. The Trustee discovered the transfer within 30 days of the trial. The Trustee made a motion to amend the Complaint to add a recovery claim for the $90,000 transfer. The Court denied the motion at the trial without prejudice. Although the $90,000 transfer is not the subject of this action, it evidences the closeness and extensive financial relationship between the Defendant and the Debtor. It also evidences the Defendant's cooperation in helping the Debtor to keep his assets out of the reach of his creditors.

transferred the assets in order to protect them from his creditors. The Defendant did not pay reasonably equivalent value in exchange for the Transfers; in fact, she gave no consideration to the Debtor. The Debtor, with the Defendant's complicity, retained control of the properties and the mortgage after the Transfers and concealed the Transfers. The Transfers were carried out by the Debtor with the actual intent to hinder, delay and defraud his creditors.

## CONCLUSIONS OF LAW

The Trustee alleges that the Transfers are fraudulent pursuant to Florida Statutes §726.105(1)(a), which provides that:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation incurred, if the debtor made the transfer or incurred the obligation:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor....

FLA. STAT ANN. §726.105(1)(a) (West 2004). Section 544(b) of the Bankruptcy Code allows a trustee to stand in the shoes of an existing unsecured creditor and permits the trustee to bring state law fraudulent conveyance and other similar actions that such a creditor could bring. 11 U.S.C. §544(b). The Trustee is empowered by §544(b) to bring this action against the Defendant.

Because direct evidence of actual intent rarely exists in a fraudulent conveyance case, courts generally look at the totality of circumstances and the badges of fraud surrounding the transfers. In re World Vision Entm't, Inc., 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002); Toy King Distrib., Inc., 256 B.R. 1, 127-8 (Bankr. M.D. Fla. 2000). "Badges of fraud" are factors strongly indicating the existence of fraudulent intent. In re Ingersoll, 124 B.R. 116, 121-2 (M.D.

6

Fla. 1991). The eleven badges of fraud to be used in determining "actual intent" pursuant to the Florida fraudulent transfer statute are set forth in §726.105(2):

>   (a) The transfer or obligation was to an insider.
>   (b) The debtor retained possession or control of the property transferred after the transfer.
>   (c) The transfer or obligation was disclosed or concealed.
>   (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
>   (e) The transfer was of substantially all the debtor's assets.
>   (f) The debtor absconded.
>   (g) The debtor removed or concealed assets.
>   (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
>   (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
>   (j) The Transfer occurred shortly before or shortly after a substantial debt was incurred.
>   (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

FLA. STAT ANN. §726.105(2) (West 2004). This list is nonexclusive based upon the plain language of the statute and courts should look at the circumstances surrounding a conveyance. In re Stewart, 280 B.R. 268, 279 (Bankr. M.D. Fla. 2001).

The presence of a single badge of fraud is not sufficient to prove intent, but "the confluence of several can constitute conclusive evidence of an actual intent to defraud. . . ." In re Toy King, 256 B.R. at 128 (quoting Max Sugarman Funeral Home, Inv. V. A.D.B. Investors, 926 F.2d 1248, 1254-5 (1st Cir. 1991). The standard used to determine whether a transfer is fraudulent as to creditors is proof by preponderance of the evidence. In re Stewart, 280 B.R. at 281.

Nearly every badge of fraud set forth in §726.105(2) is present in this case. (i) The Debtor made the Transfers to his girlfriend, with whom he had extensive financial and business

7

dealings. The Defendant is the initial transferee and an insider.[7] (ii) He retained substantial control over all of the assets after making the Transfers. (iii) The Debtor concealed the Transfers from his creditors and the Trustee. He resisted the Trustee's efforts to obtain information regarding his financial affairs and his relationship with the Defendant. (iv) The Transfers were made when the Debtor was heavily in debt and involved in litigation with creditors holding substantial claims against him. (v) The Transfers conveyed substantially all of the Debtor's assets. (vi) The Debtor concealed assets to shelter them from creditors, including his interest in Setse, Inc., which he failed to disclose in his original Schedules and Statement of Financial Affairs. (vii) The Defendant paid no consideration for the Transfers. (viii) The Debtor was insolvent at the time of the Transfers and the Transfers rendered him further insolvent. Additionally, the possibility of the Debtor absconding was high with him having no permanent physical address, living in the Defendant's RV, and using multiple addresses on publicly recorded documents.

There are substantial, additional indicia of the Debtor's fraudulent intent including: (1) the Debtor and the Defendant made misleading statements to the Trustee and obstructed his investigation, in an effort to conceal the true nature of their relationship and financial dealings. (2) The purported security interest held by the Defendant in the transferred properties was not recorded. (3) The Defendant willingly held assets for the Debtor to keep them from his creditors. (4) The debtor has shown a propensity to lie when it serves his financial interests and to hide assets from his creditors. These indicia of fraud were punctuated by the Debtor telling the

---

[7] *See* In re O'Connell, 119 B.R. 311, 316 (Bank. M.D. Fla. 1990) (finding transferees were "insiders" where the debtor and the transferees were good friends and they engaged in financial dealings that were not at "arms-length").

Trustee's counsel that it was "none of [his] damn business" how the proceeds of the alleged $90,000 loan were used.

The Trustee has established by a preponderance of the evidence the Debtor made the Transfers with actual intent to hinder, delay and defraud his creditors pursuant to Florida Statutes §726.105(1)(a). The Transfers are therefore avoidable.

Section 550 of the Bankruptcy Code, made applicable through §544, addresses the liability of the transferee of an avoidable transfer. The purpose of §550(a) is "to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." In re Green, 268 B.R. 628, 652 (Bankr. M.D. Fla. 2001) (quoting In re American Way Service Corp., 229 B.R. 530-1 (Bankr. S.D. Fla. 1999)). Section 550(a) provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. §550(a). Section 550 makes no exception for innocence. An initial transferee is liable for the fraudulent transfer even if he or she is completely innocent in the matter. Id.

The Defendant is the initial transferee of the Debtor's three parcels of real property and the Citrus Mortgage. The Transfers removed assets worth $211,054.79 from the estate. The Trustee is entitled to judgment of $211,054.79 against the Defendant individually pursuant to 11 U.S.C. §550(a).

9

The Court concludes that: (1) the Transfers constitute fraudulent transfers and are avoidable; (2) the Defendant is strictly liable for all avoided Transfers; (3) the Plaintiff is entitled to recover from the Defendant the Citrus Mortgage, the Tennessee Property, and the Sumter Lot; and (4) the Trustee is entitled to recover from the Defendant the amount of $74,000.00, the value of the Citrus Lots sold by the Defendant and the $20,000.00 she received through the refinance of the Citrus Mortgage, plus prejudgment interest at the statutory rate.

A separate judgment consistent with these Findings of Fact and Conclusions of Law shall be entered contemporaneously.

Dated this 18th day of October, 2005.

ARTHUR B. BRISKMAN
United States Bankruptcy Court